May it please the Court, Christopher Dempsey on behalf of the Federal Government Appellants. I'll reserve two minutes for rebuttal. The findings of fact in this case are clearly erroneous. To this day, Dr. Atalla refuses to admit that he was associated with the Global Relief Foundation, even though from January 1997 through July 2002, Dr. Atalla fundraised, recruited, gave speeches for, traveled both domestically and internationally, ran programs, opened a clinic, attended staff meetings and conferences, all on behalf of the Global Relief Foundation. The district court judge ruled that Dr. Atalla cured his failure to disclose his association with the Global Relief Foundation because he eventually admitted some involvement with the foundation. But the lower court completely ignored the fact that Dr. Atalla only admitted his involvement with the Global Relief Foundation after USCIS confronted him and that Dr. Atalla's subsequent testimony about the purpose, location and duration of his fundraising for GRF was false. This was clear error. In addition, the district court committed legal error in ruling that the government waived its defense that Dr. Atalla's false written statements on his application for which precluded his naturalization. Okay, well, leaving aside the waiver issue, can you help me? This was a bench trial? This was a bench trial, Your Honor. You're asking us to say that the district court's findings after hearing the witnesses were clearly erroneous? Yes, Your Honor. Can you help me with the – that's a steep hill to climb. Can you help me with the case where we've held trial court's findings clearly erroneous that's closest to this? There's not a case of this nature that my research revealed the Ninth Circuit overturning bench trial district court's findings. But this case is fairly unique, and the volume of evidence is part of the reason it's unique. Much of the case, much of the record in this case is written. This panel has the benefit of reviewing the exact same verbatim transcripts of Dr. Atalla's naturalization interviews that this district court judge relied upon, the same FISA intercepts, the same Global Relief Foundation meeting minutes and conference agendas pertinent to Atalla. And the government submits that this evidence, the record, unequivocally reveals that Dr. Atalla falsely testified to at least three matters. Again, the purpose, the location, and the duration of his fundraising activities for the Global Relief Foundation. And if you look at the evidence on these three matters, the district court findings just don't compute. They don't add up. Why don't you get down to the weeds here, and tell us where the district court made its mistake, and tell us precisely what time, date, line of testimony, and so on is false. Sure. First, as to the purpose, Dr. Atalla testified that the only fundraising he did for GRF was in connection with his trip to Azerbaijan. He took a trip on behalf of the Global Relief Foundation to set up a medical clinic in Baku, and he testified during his May 24, 2004, and June 12, 2008 naturalization interviews that all of his fundraising for GRF was related to his trip to Azerbaijan at ER 243. He testified, quote, the only fundraising I did was particularly with the trip I made. That was the only fundraising that I did with them, referring to his trip to Azerbaijan. The record reveals, however But what was the question that was put to him when he said that? The question was, what was the, why did you, essentially, why did you raise money? I don't want to know essentially. That's been part of the problem in this case, is that a lot of people thought that there were things said essentially. I'd like to know precisely what was said. And if you can give me the ER citation, that would be very helpful. Again, it's ER 243. And they're asking, and it starts on page 243 and goes to 244. And the examiner, the officer is asking how much, they start by asking how much money Atallah thinks that he raised. How much money is different from whether you were fundraising only at Azerbaijan? So what's the question where he, what's the precise question where we have a misleading answer? Well, it's actually an answer that Dr. Atallah interjects. Right, correct. So, yeah, I would say, I mean, the checks that I had they gave me connecting with that trip, near definitely $10,000. Okay, but that's in connection with the Azerbaijan. You, Counsel, you said that Atallah's only, that Atallah testified that his only fundraising efforts were in connection with the trip to Azerbaijan. I'm trying to figure out where that question comes from his interviewer and where the misleading answer is. And then the next point is, what did the district court find that's clearly erroneous? Right. Well, I'm trying to point you to Dr. Atallah's testimony, and I will spend some time before rebuttal getting the rest of the pinpoint sites for you, that he only raised money in connection with his trip to Azerbaijan. But that was unaccountable. But I keep hearing the same statement. That is, that he was only raising money in connection with the trip to Azerbaijan. I'm just asking for just, if you can give me the reference, where is it that he was asked whether, what his fundraising efforts were,  I'm just repeating what you said to me, Counsel, and I can't, I'm trying to get an answer. Right. Well, at page 56 of the transcript of the June 12, 2008 interview, lines 6 through 8, Dr. Atallah. Sorry, page 56? It's the excerpts of record 244. Dr. Atallah testified that, that the checks, that the money he raised was connecting with that trip. And I will find you, I will find you the rest of his testimony before rebuttal on the Azerbaijan trip. But I can tell you with even more certainty the pinpoint sites on the next issue, which was Dr. Atallah's testimony that all of his. I have 243 in front of me. I have 243 and 244 in front of me. In 243, he's asked, in all, how much money would you say you raised for the GRF? Answer. It would be extremely hard to know, because much of what I've done is, you know, I like to encourage people, and then I give them envelopes and stuff. Okay? I don't see any. Is there something wrong there? No. And I will find you the trial testimony as well, Your Honor. There was also trial testimony. I don't have the site. I sort of have two problems, Counsel, with the government's position here. And I just want to be very up front as to what it is I think you need to convince me today. One is that Dr. Atallah lied to a direct question. Okay? Two is that the district court then misread that in a way that is clearly erroneous. And if you have other examples, I'd like to know the other examples. I do, Your Honor. So it's even more, it's crystal clear on location. Dr. Atallah testified that all his fundraising for the Global Relief Foundation was at the local level. And this is at page ER 253. During his May 27, 2004 interview, Dr. Atallah testified that he only raised money for GRF, quote, at a local level, like when they come in and I help out. And so this is 253. Lines 9. Nine through 11. Okay. I have it here. Have you ever raised money for them at a local level? You inserted the word only. Well, I will. If you could tell me where he said only. The problem is, and this is probably the most troubling one for me, is the Tampa incident. Well, that's what I was going to get to, Your Honor. But let's get to the false statements first, and then we'll get to the proof of the falsity. In the June 12, 2008 interview, Officer Jimenez was clarifying about the fundraising and what he said was at a local level, what he meant by that. And this is at excerpts of Record 240 and 41. So in a statement that I read from, and this is a written sworn statement that Dr. Atallah provided to USCIS about the location of his fundraising. So Officer Jimenez is referring to that starting at line four. Okay, okay. In the statement that I read from, from the sworn statement, you made a comment that you raised funds in the local area. What is the local area? Answer. The local Islamic center or a mosque. Question. Okay. Answer. This is the one in Kentucky. In Kentucky, correct. So Dr. Atallah clarifies that he only raised money for GRF at his local mosque or Islamic center in Kentucky. Well, Tampa is not in Kentucky, Your Honor. And the record's very clear that Dr. Atallah took a well-planned trip to Tampa, Florida, at the behest of Dr. Muhammad Jihadi, and raised about $3,000 or $4,000 from the congregation and about $25,000 at a small meeting. What did the government learn of the Tampa trip? These were in FISA intercepts that the government introduced at trial in a multiple, multiple conversations between Dr. Jihadi and Dr. Atallah planning for his fundraising trips. In fact, when he came back from that trip. And they mentioned Tampa in the FISA intercepts? Yes. It's crystal clear. As a matter of fact, on Tampa. Yes. So when Dr. Atallah came back from Baku, Dr. Jihadi had wrote in an e-mail that he was ready to travel on a weekly program for fundraising, and we should start to schedule him after that date he's fully charged. And so he then traveled to Tampa, Florida, to raise money for GRF. He reported to Jihadi, and this is at the excerpts of record 511 through 512, that he didn't collect much at the mosque, only about $3,000. But at the, quote, other meeting, he collected $25,000 with other brothers sending money later. And this was where he was instructed to give a sermon and meet with the imam, and GRF paid his travel to go down there. So this wasn't just a spur-of-the-moment trip that would slip your mind. This was a trip to Tampa, and, again, not at the local level. And this is the whole point. Dr. Atallah repeatedly tried to characterize his involvement with GRF as minimal because he was trying to avoid any jeopardy to his questions that might be raised by having associated so substantially with a designated terrorist organization. And then we get to duration. Dr. Atallah's testimony was that he did not raise money for GRF after accusations arose that GRF had ties to terrorism. And we're looking at excerpts of record 259. And the question at the bottom of, I'm sorry, 258, during the May 27, 2004, sworn interview, was the question, okay, okay, when did you first become aware of accusations about the Global Relief Foundation's connections to terrorism? Answer, when it came about in the media post-September 11. Question, okay, did you continue to donate money or participate in fundraising activities for this organization after you became aware of these accusations? Answer, no. That was false testimony for several reasons. First, Jamal Atallah was aware of accusations that GRF had terrorist ties as early as February 19, 2000. There was a New York Times article fingering GRF as a charity used to move men, money, and weapons across borders for terrorist organizations. The article was distributed and discussed among GRF personnel. And in fact, at excerpts of record 489, Jamal Atallah and Chahadi specifically referenced the article and described it as, quote, lies and fabrications all instigated by Jews here in America. And then as late as November 3, 2001, Jamal Atallah is lamenting that the accusations in the media are making it hard to collect money for the Global Relief Foundation. Excerpts of record 484 to 486 detail this. And he says, quote, I'm trying to schedule programs, brother, and no one's giving me money. Man, I'm telling them and none of them is agreeing. Let's take the Tampa incident very quickly and then the duration question, the one at ER 258 and 259. What did the district court find on those with respect to those incidents? The district court stopped short of actually making findings on the falsity of the Tampa testimony or the location of my fundraising testimony and the duration. The what the district court did is it oversimplified the case and it looked at Dr. Atallah did admit that he Did the district court mention Tampa? If he did, it was only in passing that he took a trip to Tampa to raise money, but it was not discussed or analyzed in connection with the government's argument that this was false testimony. It was not a part of the district court's And how about the exchange at page 250, 258 to 259 on the ER? Was that discussed by the district court? This was not discussed and analyzed in connection with the government's argument that this constituted false testimony, that the district court merely said that Dr. Atallah, although he did deny being associated with GRF and you want to quarrel with the label that he gave it, I'll see you out of time. May I conclude? I'd like you to finish the question, yeah. Even though he eventually or, you know, we don't want to argue about terms, but he answered all the questions about GRF and therefore the record's clear. The district court didn't analyze whether or not Dr. Atallah's actual testimony about the extent of his involvement with GRF was true or false, and in particular the purpose, the location, and the duration of his fundraising. The district court just didn't look at this. He just took it as, well, he admitted involvement. And that really gets to the point because the bar at 1101F6, there's no materiality requirement. It's not about completing the record or gathering information. The test is good moral character. It's about whether or not somebody's honest and trustworthy. So it's not the issue isn't whether or not the government got all its questions answered. It's whether or not Dr. Atallah lied with the intent to deceive. Thank you, Your Honor. Thank you. Mr. Hammond. Good morning. May it please the Court. My name is Larry Hammond, and I represent Dr. Jamal Atallah. I think it would help if I took just a moment and put the record in this case into perspective, in light particularly of the Court's questions. Dr. Atallah, in this case, has helped us create an extensive record with respect to everything he said to the government along the way at a level that I suspect is uncommon in the experiences of most applicants for citizenship and maybe most courts. The standard here, as the Court is well aware, is whether the district court ruling was clearly erroneous, taking into account the most favorable interpretation reasonably of the facts developed. We also have here a situation in which the issue before the Court then and the issue before this Court now arises under the subsection of the immigration laws that says someone forfeits his right to become a citizen or is disqualified because they made a false statement. And that statement needs to be a statement that was made orally. It needs to have been made under oath. It needs to be false and subjectively intended to occasion or create an immigration benefit. That standard was well known to Judge Wake when he tried this case. There was no doubt that he understood what that standard was. And what did he have to deal with? He had two recorded interviews with immigration, one of them in 2004 and one of them in 2008. Thankfully, we have a record of exactly what questions were asked to Dr. Atala and how he answered them. We also have the benefit of at least the first of those was also video recorded. And the portions of the video recording were played at trial. We also have an extensive deposition taken by the government prior to the trial. I think it's approximately 200 pages. The government chose not to introduce the entire deposition itself, but it used that deposition extensively in cross-examining Dr. Atala at trial. We have a trial now in which Dr. Atala is on the stand both in his case and again in rebuttal. The entire testimony must be in excess of 150 pages. The judge asks extensive questions as the case goes along. And on issue after issue after issue, as you now know from the judge's decision, he concluded that Dr. Atala never lied to anybody. He never intended to make a false statement on any of the issues with respect to his application for citizenship, and particularly the ones related to the Global Relief Foundation. And the court knows that immediately before trial we had the discovery that there had been Foreign Intelligence Surveillance Act intercepts that had gone on for some extended period of time, 10 or 11 years before the trial. They were disclosed late. The court ultimately allowed, with our approval, with Dr. Atala's approval, that those intercepts be admitted into evidence so that the court could have the fullest picture of this man's history and his statements made over the years. Were you representing, just out of curiosity, were you representing Dr. Atala throughout the district court proceedings? I was, Your Honor. And at the time of the deposition as well? At the time of the deposition and at trial and since then. And I think when we look at all of those things together, it's quite obvious why the judge concluded that this man was not deliberately lying to anyone. In terms of his good moral character, which is, after all, the first issue, as the judge said, this is a man of possibly the best moral character. Everything that was presented to the court confirmed his education, his family background, his history, and his charitable giving, both personally and because of his Muslim faith. The court talked about Zakat, one of the five pillars of Islam, and the fact that Dr. Atala and his wife, who is also a doctor, made countless donations to charities. The estimate of trial was in excess of 60 different organizations that he had made contributions to. And then when the questioning came to global relief, Dr. Atala told what he could remember, and he told it over and over again. And on the question of the trip to Tampa, let me spend a moment on that. At the time of his interview in 2004, he said, I raised funds at the local level. He wasn't asked if that was the only place he had done it, but that's what he remembered at the time. When he was deposed prior to trial, and this is in the record because the government questioned Dr. Atala about it at trial. Was that 2010? The trial was 2011. How about the deposition? Deposition was shortly before the trial. 2011. But very importantly, it may have been late 2010, but either 2010 or early 2011. Importantly, at the time of his deposition, the government knew about the FISA intercepts. Dr. Atala did not. But yet in his deposition, when asked about fundraising and pointed questions, well, are you sure that you didn't raise funds anywhere else, he said, I did take one trip to Tampa. And he was raising money, trying to raise money for medical supplies for the clinic in Baku, Azerbaijan. And he testified to that in his deposition before he knew that there were any FISA intercepts at all. So when we get to that issue at trial, Judge Wake, I think, had a perfectly adequate basis to say, well, this man clearly was not deliberately lying to obtain an immigration benefit. It was one of many things he had done. And some of them he did on behalf of GRF. And so when we go through the entire record in this case, I think there may not be, as I said, a better case for applying the clearly erroneous standard which I think governs this proceeding. Were these inconsistencies and problems that the government raises in its brief call – I don't have a docket sheet here. Were they presented to the district court in a motion for rehearing? I don't believe so, Your Honor. After the findings. I don't believe they filed a motion for reconsideration. It certainly is not in the record. And I don't know. So did the district court make any findings with regard to his testimony about the Tampa trip? Not specifically about the Tampa trip. The court did summarize from about pages 10 to I think 20 what had happened in the interviews. And the judge talked about the various questions that had been asked. But I don't think there is a specific place where he says that the Tampa trip itself What about the testimony in the 2004 interview at ER 258 and 259 where he's asked whether he continued to donate money or participate in fundraising activities for these organizations after you became aware of these accusations? Yes. And he was – I'm glad you reminded me of that, Your Honor. This is one of the things that I think was most telling about the case. Dr. Atala, after he left the 2004 interview, remembered that after September 11th, he had made two relatively small donations, not to GRF, but to what was called the fund that was approved by the government of the United States for people who wanted to make contributions, people who didn't believe that GRF was a terrorist organization. He wrote a letter, Your Honor, and I think this is very important. Dr. Atala, long before he'd ever met me, he wrote a letter to the immigration official in St. Louis, Missouri. This is the letter he wrote from St. Louis? Yes. Saying I had – I want to clarify the record. I did make two donations to the legal defense fund. And I think that really proves the quality of his intent to tell the truth throughout. He never had any intent to tell a false word to anyone in this process. And I think when you look at the whole record, that becomes entirely clear. And as the judge concluded at the end of the case, he was left with not only a conviction, but a strong conviction that Dr. Atala had not lied at any point in his immigration process. And although clearly the standard that the Court had before it was a preponderance of the evidence standard, the Court said even if I were to apply a clear and convincing standard, I would rule in this man's favor. Thank you. I'm sorry? Yes. Yes. And after that, and that is – the government has appealed that separately, but the Court did find that the government's position was without substantial justification and awarded our attorneys' fees. Thank you, Mr. Hammond. Thank you, Your Honor. Mr. Dempsey, you've got time. I'll give you a – I think you've consumed your time, but I'm going to give you a minute for response here. Thank you, Your Honor. Let's put two minutes on the clock, and that way you'll be comfortable and we will,  Earlier, I promised that I would find the pinpoint site for you on Dr. Atala's testimony that the only fundraising he did for GRF was in connection with his trip to Azerbaijan. I have found that for you. That is at Excerpts of Record 240, and that is lines 9 through 14. The examiner – I'm sorry. Which interview is that? This is the June 12, 2008 interview by Officer Jimenez, and Dr. Atala testifies, I mean, the fundraising that I did was particularly with the trip that I made, so I wanted. And then the officer interjects, okay, was that the only fundraising you did was for that trip? Dr. Atala's answer, that was the only. That's the only fundraising I did with them. Yet we have intercepts that reveal in October 1999, Atala coordinated $10,000 worth of donations to a GRF program. In March 2000, he coordinated, quote, collection of donations and such, letting the checks be in the name of the Islamic Center, transfer through GRF, given by hand. Other intercepts reveal on April 2000, Atala sent GRF checks, quote, for the projects that we In June 2000, GRF Executive Director Mohammad Chahadi is asking who is in charge of Jamal Atala's program. And in December 2000, Chahadi is accounting for donations and advising that Jamal Atala's money hasn't arrived. And again in November 2001, Dr. Atala testifies, states in the intercept, I'm trying to schedule programs, brother, no one's giving me money, man, I'm telling them and none of them is agreeing. So clearly, the only fundraising that Dr. Atala, the fundraising Dr. Atala did for GRF extended well beyond his trip to Azerbaijan. He just didn't want the USCIS to know about that so that they would ask the hard questions about his involvement in an organization now designated as terrorist. The problem, counsel, is that the government didn't always ask the hard questions. If they did, they didn't ask them very precisely. And we have to take questions that were on the form and repeated them and altered the form of the questions and omitted part of the sentence and then thought that they had tripped him up and that he had answered the questions incorrectly. And I'm looking at ER 240, and I had previously circled the words only in two of his answers. But the question is just not very precise. It's not entirely clear what it is that the questioner wants. And Dr. Atala has said, well, the fundraising I did was particularly with the trip I made. Well, was that the only thing that you did? Yeah, it was the only thing I did. Well, only is that in response to the question about particularly? You know, these are words that the government is demanding a great deal of precision where it was not capable of being precise itself. Unfortunately, we have to benefit in the burden of a written record in this case. I'm over time, Your Honor. Well over time. I appreciate your consideration. Okay. We thank you for your argument. We thank both counsel for a helpful argument in a very complex case. That case is order submitted for decision. And we will take up the case of United States v. Ibarra Ramirez. Thank you.
judges: Beistline, Schroeder, Bybee